## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| E.S., an individual;<br><br>Plaintiff,<br><br>-against-<br><br>BEST WESTERN INTERNATIONAL, INC.; MARRIOTT INTERNATIONAL, INC.; ESA MANAGEMENT, LLC; G6 HOSPITALITY, LLC; WYNDHAM HOTELS AND RESORTS, INC.; AND CHOICE HOTELS INTERNATIONAL, INC.,<br><br>Defendants. | CIVIL ACTION NO: 3:20-CV-00050<br><br>**FIRST AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff E.S., by and through the undersigned counsel, and respectfully submits her First Amended Complaint for damages and makes the following averments.

## INTRODUCTION

1.      For years, sex trafficking ventures have openly operated in and out of Defendants' brand hotels throughout the United States.  Defendants, as defined below, and their brand hotels remain willfully blind to the criminal misconduct in order to continue earning a profit from sex trafficking through room rental and brand royalties, including the trafficking of Plaintiff.

2.      ESA Management, LLC (hereinafter "ESA"), G6 Hospitality, LLC (hereinafter "G6"), Marriott International, Inc. (hereinafter "Marriott"), Best Western International, Inc. (hereinafter "Best Western"), Wyndham Hotels and Resorts, Inc. (hereinafter "Wyndham") and Choice Hotels International, Inc. (hereinafter "Choice") (collectively "Defendants") knew and have known for more than a decade that sex trafficking repeatedly occurs under their brand flag throughout the country.

3.      Defendants failed to take timely and effective measures to thwart sex trafficking at their brand hotels.  Instead, ESA, G6, Marriott, Best Western, Wyndham and Choice ignored the open and obvious presence of sex trafficking on their brand hotels and derived profit from rooms rented and used for this specific purpose.

4.       This action for damages is brought by the Plaintiff (hereinafter "Plaintiff" or "E.S."), a victim under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

5.      E.S. was first trafficked for commercial sex at the age of 21 years old in Fort Worth/Dallas, Texas.  She was coerced into trafficking by a friend of her sisters as he promised her that he would take care of her.  He told her that he knew of a way she could build a future for herself and her young daughter but, in order to do so, she just had to do what he said. Her trafficker coerced E.S. into sexual servitude under the façade of financial security and a better life for her daughter.  Rather, her trafficker used E.S.'s ambition and desire for economic security to force her into sexual servitude.

6.      Plaintiff now brings this action for damages against the Defendants listed herein. Each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

7.      E.S. was advertised on www.backpage.com against her will, physically tortured, and then sexually exploited under such duress at hotels in Arlington, Garland, Fort Worth, Grand Prairie, Dallas, Addison and Mesquite, Texas including the Baymont Inn®, Days Inn®, Super 8®, Microtel®, La Quinta®, Best Western®, Wingate Hotel®, Howard Johnson®, Fairfield Inn and Suites®, Extended Stay America®, Studio 6®, La Quinta®  and Quality Inn®.

8.      As a direct and proximate result of the Defendants' consistent refusals to prevent human trafficking for commercial sex at their brand hotel properties, E.S. was trafficked, sexually exploited, and repeatedly and brutally victimized at Defendants' brand hotels in violation of 18 U.S.C. § 1591(a).

9.      Plaintiff brings this action pursuant to the TVPRA, 18 U.S.C. § 1595, against Defendants who enabled, harbored, held, facilitated, and financially benefited from sex trafficking ventures in which E.S. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. § 1591(a).

10.     Each of the above captioned Defendants knowingly profited from the sex trafficking venture that compelled and sustained Plaintiff in sexual servitude and are therein liable for the injuries inflicted upon E.S. by her traffickers because of their marked failure as innkeepers to exercise diligence consistent with a duty of care, let alone a heightened duty of care.  Diligence that would have led Defendants to discover the horrific acts that were being committed.  Thus, Defendants conspired, enabled, and otherwise worked together in the abuse and exploitation of Plaintiff in keeping her invisible.

**PARTIES**

11.     Plaintiff, having moved to proceed anonymously,[1] and, herein, identified by her initials E.S., was only 21 years old when she was sold for sex and trafficked throughout the state of Texas.  The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).  The Plaintiff currently resides in Tarrant County, Texas.

---

[1] Contemporaneously with the Complaint, Plaintiff E.S. filed a Motion for Protective Order and Leave to Proceed Anonymously with Memorandum in Support based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. The Motion is pending. Undersigned Counsel will provide her identity to counsel for the Defendants upon proper entry of a Protective Order.

3

12.      Defendant Wyndham Hotels and Resorts, Inc. (hereinafter "Wyndham") is a Delaware corporation with its headquarters in Parsippany, New Jersey.   Wyndham is a hospitality company that, at the time of the incidents alleged herein, directly and through its agents, affiliates, and subsidiaries, offer public lodging services at the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels under the Wyndham brand:

a.   Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels are Wyndham brand hotels.

b.   As of 2018, La Quinta Holdings, Inc. is a wholly owned subsidiary of Wyndham.  Wyndham is the successor entity to La Quinta Holdings, Inc. and retains successor liability for the wrongful acts of the predecessor.

c.   As a hotel operator, Wyndham controls the training and policies for its branded hotels including the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, La Quinta® and Howard Johnson® hotels where E.S. was trafficked. Wyndham maintains that it considers guest safety and security important, and requires the hotels in its portfolio to comply with Wyndham brand standards and all local, state, and federal laws.

d.   Through its relationship with the staff at the Wyndham® brand hotels where E.S. was trafficked, and the hotel guest perpetrator who trafficked E.S. at Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, La Quinta® and Howard Johnson® hotels, Wyndham knowingly benefited or received something of value from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

4

e.   Wyndham receives a percentage of the gross room revenue from the money generated by the operations of all Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, La Quinta® and Howard Johnson® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which Plaintiff was sex trafficked.

f.   Wyndham owns, supervises, and/or operates the Baymont Inn® hotel located at 2401 Diplomacy Drive in Arlington, the Super 8® hotels located at 1905 West Pleasant Ridge Road and at 2710 East Abram Street in Arlington, the Microtel® hotel located at 1901 Pendleton Drive in Garland, the Wingate® hotel located at 8650 North Stemmons Freeway in Dallas, the Days Inn® hotel located at 1901 West Pleasant Ridge Road in Arlington, the La Quinta® hotels located at 4900 Bryant Irvin Road and 4700 North Freeway in Fort Worth, and 4001 Scots Legacy Drive in Arlington, and the Howard Johnson® hotel located at 2001 East Copeland Road in Arlington, Texas.

g.   Wyndham is subject to the jurisdiction of this Court because it regularly transacts business in Texas, operates dozens of hotels in Texas, including the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels listed above, contracts to supply services in Texas, caused indivisible injuries to the Plaintiff in Texas, and profited from an illegal sex trafficking venture at Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels located in Texas.

13.   Defendant Choice Hotels International, Inc. (hereinafter "Choice") is a Delaware corporation with its principle place of business located at 1 Choice Hotels Circle in Rockville,

Maryland. Choice is a hospitality company that, at the time of the incidents alleged herein, directly and through its agents, affiliates, and subsidiaries, offer public lodging services at the Quality Inn® hotels under the Choice brand. Choice Hotels is registered with the Secretary of State to conduct business in the State of Texas:

 a. Quality Inn® hotels are Choice brand hotels.

 b. As a hotel operator, Choice controls the training and policies for its brand hotels including the Quality Inn® hotels where E.S. was trafficked. Choice maintains that it considers guest safety and security to be important, and requires the hotels in its portfolio to comply with Choice brand standards and all local, state, and federal laws.[2]

 c. Through its relationship with the staff at the Quality Inn® hotels where E.S. was trafficked and the hotel guest perpetrator who trafficked E.S. at the Quality Inn® hotels, Choice knowingly benefited, or received something of value from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

 d. Choice receives a percentage of the gross room revenue from the money generated by the operations of Quality Inn® hotels, including a percentage of the revenue generated for the rate charged on the hotel guest rooms in which Plaintiff was sex trafficked.

 e. Choice owns, supervises, and/or operates the Quality Inn® hotels located at 121 East Interstate 20 in Arlington, 3891 South Great Southwest Parkway in Grand Prairie, Texas, 923 Windbell Circle in Mesquite, 4555 Belt Line Road,

---

[2] Choice Hotels International Inc., Human Rights Policy, https://www.choicehotels.com/about/diversity/human-rights.

in Addison, and 10835 Composite Drive in Dallas, Texas.

    f.   Choice is subject to the jurisdiction of this Court because it regularly transacts business in Texas, operates dozens of hotels in Texas, including the Quality Inn® hotels listed above, contracts to supply services in Texas, caused indivisible injuries to the Plaintiff in Texas, and profited from an illegal sex trafficking venture at Choice owned Quality Inn® locations across the state of Texas.

14.    Defendant Best Western International, Inc. (hereinafter "Best Western") is an Arizona corporation with its principle place of business located at 6201 N. 24th Parkway in Phoenix, Arizona. Best Western is a hospitality company that, at the time of the incidents alleged herein, directly and through its agents, affiliates, and subsidiaries, offer public lodging services at the Best Western® hotels under the Best Western brand. Best Western is registered with the Secretary of State to conduct business in the State of Texas:

    a.   Best Western® is a Best Western brand hotel.

    b.   As a hotel operator, Best Western controls the training and policies for its branded hotels including the Best Western® hotel where E.S. was trafficked. Best Western maintains that it considers guest safety and security important, and requires the brand hotels in its portfolio to comply with Best Western brand standards and all local, state, and federal laws.[3]

    c.   Through its relationship with the staff at the Best Western® where E.S. was trafficked and the hotel guest perpetrator who trafficked E.S. at the Best Western®, Best Western knowingly benefited, or received something of value

---

[3] Best Western International Human Rights Policy, https://www.bestwestern.com/en_US/about/press-media/best-western-human-rights-policy.html (last visited Nov. 20, 2019).

from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

d. Best Western receives a percentage of the gross room revenue from the money generated by the operations of all Best Western® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

e. Best Western owns, supervises, and/or operates the Best Western® hotels located at 201 West Loop 820 North in Fort Worth and at 2075 North State Highway 360, Grand Prairie, Texas.

f. Best Western is subject to the jurisdiction of this Court because it regularly transacts business in Texas, operates dozens of hotels in Texas, including the Best Western® locations listed above, contracts to supply services in Texas, caused indivisible injuries to the Plaintiff in Texas, and profited from an illegal sex trafficking venture at multiple Best Western® locations in the state of Texas.

15.     Defendant Marriott International, Inc. (hereinafter "Marriott") is a Delaware corporation with its principle place of business located at 10400 Fernwood Road in Bethesda, Maryland.  Marriott is a hospitality company that, at the time of the incidents alleged herein, directly and through its agents, affiliates, and subsidiaries, offer public lodging services at the Fairfield Inn® hotels under the Marriott brand.  Marriott is registered with the Secretary of State to do business in the State of Texas:

a. Fairfield Inn® hotels are Marriott brand hotels.

b.  As a hotel operator, Defendant Marriott controls the training and policies for its brand hotels including the Fairfield Inn® hotel where E.S. was trafficked. Defendant Marriott maintains that it considers guest safety and security important, and requires the brand hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[4]

c.  Through its relationship with the staff at the Fairfield Inn® where E.S. was trafficked and the hotel guest perpetrator who trafficked E.S. at the Fairfield Inn®, Marriott knowingly benefited, or received something of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

d.  Marriott receives a percentage of the gross room revenue from the money generated by the operations of Fairfield Inn® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

e.  Marriott owns, supervises, and/or operates the Fairfield Inn® hotels located at 2500 E. Lamar Boulevard in Arlington and at 2110 Market Center Boulevard and North Stemmons Freeway in Dallas, Texas.

f.  Marriott is subject to the jurisdiction of this Court because it regularly transacts business in Colorado, operates dozens of hotels in Colorado, including the Fairfield Inn and Suites® locations listed above, contracts to supply services in Texas, caused indivisible injuries to the Plaintiff in Texas, and profited from an illegal sex trafficking venture at multiple Fairfield Inn

---

[4]   Marriott   International   Inc.,   Human   Rights   Policy   Statement   (July   2017)   available   at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

and Suites® in the state of Texas.

16.     Defendant G6 Hospitality LLC ("G6") is a Delaware corporation with its principle place of business located at 4001 International Parkway in Carrollton, Texas.  G6 is a hospitality company that, at the time of the incidents alleged herein, directly and through its agents, affiliates, and subsidiaries, offer public lodging services at the Studio 6® hotels under the G6 brand:

    a.  Studio 6® hotels are G6 brand hotels.

    b.  As a hotel operator, G6 controls the training and policies for its brand hotels including the Studio 6® hotel where E.S. was trafficked. G6 maintains that it considers guest safety and security to be important, and requires the brand hotels in its portfolio to comply with G6 brand standards and all local, state, and federal laws.[5]

    c.  Through its relationship with the staff at the Studio 6® hotel where E.S. was trafficked and the hotel guest perpetrator who trafficked E.S. at the Studio 6® hotel, G6 knowingly benefited, or received something of value from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

    d.  G6 Hospitality receives a percentage of the gross room revenue from the money generated by the operations of Studio 6® hotels, including a percentage of the revenue generated for the rate charged on the hotel guest rooms in which the Plaintiff was sex trafficked.

---

[5] G6 Hospitality International, Inc., Our Impact, https://g6hospitality.com/about-us/our-impact-2/ (last visited Dec. 5, 2019).

e.  G6 Hospitality owns, supervises, and/or operates the Studio 6® hotel located at 1980 West Pleasant Ridge Road in Arlington, Texas.

f.  G6 Hospitality is subject to the jurisdiction of this Court because it regularly transacts business in Texas, operates dozens of hotels in Texas, including the Studio 6® hotel listed above, contracts to supply services in Texas, caused indivisible injuries to the Plaintiff in Texas, and profited from an illegal sex trafficking venture at a G6 owned Studio 6® location in the state of Texas.

17.    Defendant ESA Management, LLC ("ESA") is a Delaware limited liability company with its principle place of business located at 11525 N. Community House Road in Charlotte, North Carolina. ESA is a hospitality company that, at the time of the incidents alleged herein, directly and through its agents, affiliates, and subsidiaries, offer public lodging services at the Extended Stay America® hotels under the ESA brand.  It is registered with the Secretary of State to do business in the State of Texas:

a.  Extended Stay America® hotels are ESA hotels.

b.  As a hotel operator, ESA controls the training and policies for its brand hotels including the hotel where E.S. was trafficked. ESA maintains that it considers guest safety and security to be important, and requires the hotels in its portfolio to comply with ESA brand standards and all local, state, and federal laws. [6]

c.  Through its relationship with the staff at the Extended Stay America hotel where E.S. was trafficked and the hotel guest perpetrator who trafficked E.S. at the Extended Stay America hotel, Defendant ESA knowingly benefited, or

---

[6] Extended Stay America, Inc., Social Responsibility Tear Sheet, https://www.aboutstay.com/static-files/46bac423-97b6-45f3-85c4-f0667d054e08. See also, Extended Stay America, Inc., Code of Business Conduct and Ethics, https://www.aboutstay.com/static-files/03473452-8291-47f2-9245-3b8fd21253f1 (last visited 1/8/2020).

received something of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

d.  ESA receives a percentage of the gross room revenue from the money generated by the operations Extended Stay America hotels, including a percentage of the revenue generated for the rate charged on the hotel guest rooms in which the Plaintiff was sex trafficked.

e.  ESA owns, supervises, and/or operates the Extended Stay America hotel located at 1221 North Watson Road, Arlington, Texas.

f.  ESA is subject to the jurisdiction of this Court because it regularly transacts business in Texas, operates dozens of hotels in Texas, including the Extended Stay America hotel listed above, contracts to supply services in Texas, caused indivisible injuries to the Plaintiff in Texas, and profited from an illegal sex trafficking venture at a Extended Stay America hotel location in Texas.

18.  Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

19.  This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 as this action arises under the Constitution, laws, or treaties of the United States, based upon federal claims asserted pursuant to 18 U.S.C. § 1595.

20.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

21.     Venue is proper within this District Court as this District Court is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(b)(2), as well as the Texas Long-Arm statute.

22.     Defendants have consensually submitted to the jurisdiction Texas and have purposefully availed themselves of the privilege of conducting acts in Texas through Defendants' dominion and control over their respective brands with franchisor subsidiaries, franchisee subsidiaries and operating hotels, and day-to-day operation of the hotels, and, thus, invoking the benefits and protections of the laws in Texas; Texas has an equally strong interest in protecting and assuring the safety of persons within its State.

23.     Defendants have consensually submitted to the jurisdiction Texas and have purposefully availed themselves of the privilege of conducting acts in Texas which is imputed through the conduct of franchisor subsidiaries, franchisee subsidiaries and operating hotels as a result of Defendants' dominion and control over its brand, thus, invoking the benefits and protections of the laws in Texas; Texas has an equally strong interest in protecting and assuring the safety of persons within its State.

## SEX TRAFFICKING UNDER FEDERAL LAW

24.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by

force, fraud, or coercion."  This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

25.     While the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

26.     Pursuant to 18 U.S.C. §1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking.  This includes, at a minimum, both the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work and the buyers who obtain, solicit, and/or patronize forced commercial sex work.[7]  Both the 'traffickers' and buyers therefore trafficked Plaintiff and paid for the rooms from which Defendants profited.

## FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

27.     "75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…  Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[8]

28.     Reports by The Polaris Project were received and reviewed by the executives, directors and managers of each Defendant.

29.     Upon information and belief, other publically available information regarding trafficking in hotels was received and reviewed by each Defendant during the time period 2006 to 2019.

---

[7] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law **both** categories are 'traffickers'.

[8] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

30.     Upon information and belief, between at least 2006 and 2019, each Defendant held meetings among their executives, directors and managers at which sex trafficking in hotels was discussed.

31.     Upon information and belief, during at least the 2006 to 2019 time period, emails were exchanged by employees of Defendants that related to sex trafficking in hotels including each Defendants' brand hotels.

32.     Defendant played a crucial role in the sex trade, as to all hotels.[9]

33.     Each Defendant permitted anonymity to the buyers and non-traceability, making them ideal venues for sex traffickers to sell Plaintif f for sex.

34.     Each Defendant knew or should have known that the anonymity for buyers and non-traceability of their presence at its hotels made their hotels ideal venues that were indeed used for sex trafficking.

35.     Each Defendant, prior to the information being known publically, knew or should have known, that hotels are the top-reported venue where sex trafficking acts occur.[10]

36.     Best Western knew or should have known that trafficking was taking place from at least 2006 through 2019 at the Best Western® brand hotel.

37.     Marriott knew or should have known that trafficking was taking place from at least 2006 through 2019 at the Fairfield Inn® hotel.

38.     ESA knew or should have known that trafficking was taking place from at least 2006 through 2019 at the Extended Stay America® hotel.

39.     G6 knew or should have known that trafficking was taking place from at least

---

[9] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[10] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

2006 through 2019 at the Studio 6® hotel.

40.     Wyndham knew or should have known that trafficking was taking place from at least 2006 through 2019 at the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels.

41.     Choice knew or should have known that trafficking was taking place from at least 2008 through 2019 at the Quality Inn® hotels.

42.     Best Western knew that traffickers used its brand hotels, including the Best Western® brand hotel, as hubs of operations.  Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

43.     Marriott knew that traffickers used its brand hotels, including the Fairfield Inn® hotel, as hubs of operations.  Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

44.     ESA knew that traffickers used its brand hotels, including the Extended Stay America® hotel, as hubs of operations.  Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

45.     G6 knew that traffickers used its brand hotels, including the Studio 6® hotel, as hubs of operations.  Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

46.     Wyndham knew that traffickers used its brand hotels, including the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels, as hubs of operations.  Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

47.    Choice knew that traffickers used its brand hotels, including the Quality Inn® hotels, as hubs of operations.   Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

48.    Defendants knew or should have known that this is referred to as an "in call."

49.    Best Western knew or should have known that its hotels, including the Best Western® brand hotel, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.   Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

50.    Marriott knew or should have known that its hotels, including the Fairfield Inn® hotel, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.   Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

51.    ESA knew or should have known that its hotels, including the Extended Stay America® hotel, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.   Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

52.     G6 knew or should have known that its hotels, including the Studio 6® hotel, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.  Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

53.     Wyndham knew or should have known that its hotels, including the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

54.     Choice knew or should have known that its hotels, including the Quality Inn® hotels, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.  Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

55.     At all relevant times herein, each Defendant knew or should have known that sex trafficking in hotels was industry wide, included its hotels, and that a significant portion of all sex trafficking was taking place at its brand hotels.[11]

---

[11] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

56.     Due to the complacency of each Defendant on addressing the issue, hotels are *the* venue of choice for sex trafficking.[12]

57.     From at least 2006 through 2019 and to date, traffickers and buyers used and use hotel rooms, including those rented by each Defendant, due to each Defendants' failures and/or refusals to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

58.     Upon information and belief, prior to 2019, despite a duty to do so, Best Western took inadequate measures to prevent sex trafficking at its brand hotels and profiting from sex trafficking at its brand hotels.

59.     Upon information and belief, prior to 2019, despite a duty to do so, Marriott took inadequate measures to prevent sex trafficking at its brand hotels and profiting from sex trafficking at its brand hotels.

60.     Upon information and belief, prior to 2019, despite a duty to do so, ESA took inadequate measures to prevent sex trafficking at its brand hotels and profiting from sex trafficking at its brand hotels.

61.     Upon information and belief, prior to 2019, despite a duty to do so, G6 took inadequate measures to prevent sex trafficking at its brand hotels and profiting from sex trafficking at its brand hotels.

62.     Upon information and belief, prior to 2019, despite a duty to do so, Wyndham took inadequate measures to prevent sex trafficking at its brand hotels and profiting from sex trafficking at its brand hotels.

---

[12] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

63.     Upon information and belief, prior to 2019, despite a duty to do so, Choice took inadequate measures to prevent sex trafficking at its brand hotels and profiting from sex trafficking at its brand hotels.

64.     Upon information and belief, prior to 2019, Best Western, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its brand hotels or profiting from sex trafficking at its brand hotels, including the Best Western® brand hotel.

65.     Upon information and belief, prior to 2019, Marriott, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its brand hotels or profiting from sex trafficking at its brand hotels, including the Fairfield Inn® hotel.

66.     Upon information and belief, prior to 2019, ESA, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its brand hotels or profiting from sex trafficking at its brand hotels, including the Extended Stay America® hotel.

67.     Upon information and belief, prior to 2019, G6, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its brand hotels or profiting from sex trafficking at its brand hotels, including the Studio 6® hotel.

68.     Upon information and belief, prior to 2019, Wyndham, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its brand hotels or profiting from sex trafficking at its brand hotels, including the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels.

69.     Upon information and belief, prior to 2019, Choice, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its brand hotels or profiting from sex trafficking at its brand hotels, including the Quality Inn® hotels.

70.     Upon information and belief, each Defendant, through their employees, including executives, directors and managers, decided not to take any measures to prevent sex trafficking at their brnad hotels in order to conceal the fact that sex trafficking was occurring at their brand hotels.

71.     Upon information and belief, each year, from at least 2006 until 2019, Best Western received information indicating that sex trafficking had occurred at one of its brand hotels.

72.     Upon information and belief, each year, from at least 2006 until 2019, Marriott received information indicating that sex trafficking had occurred at one of its brand hotels.

73.     Upon information and belief, each year, from at least 2006 until 2019, ESA received information indicating that sex trafficking had occurred at one of its brand hotels.

74.     Upon information and belief, each year, from at least 2006 until 2019, G6 received information indicating that sex trafficking had occurred at one of its brand hotels.

75.     Upon information and belief, each year, from at least 2006 until 2019, Wyndham received information indicating that sex trafficking had occurred at one of its brand hotels.

76.     Upon information and belief, each year, from at least 2006 until 2019, Choice received information indicating that sex trafficking had occurred at one of its brand hotels.

77.     Upon information and belief, each year, from 2006 until 2019, Best Western received information from media reports and/or law enforcement indicating that sex trafficking

had occurred at one of its brand hotels.

78.    Upon information and belief, each year, from 2006 until 2019, Marriott received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its brand hotels.

79.    Upon information and belief, each year, from 2006 until 2019, ESA received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its brand hotels.

80.    Upon information and belief, each year, from 2006 until 2019, G6 received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its brand hotels.

81.    Upon information and belief, each year, from 2006 until 2019, Wyndham received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its brand hotels.

82.    Upon information and belief, each year, from 2006 until 2019, Choice received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its brand hotels.

83.    At all relevant times, Best Western had the financial resources to train hotel staff to identify the signs of sex trafficking.

84.    At all relevant times, Marriott had the financial resources to train hotel staff to identify the signs of sex trafficking.

85.    At all relevant times, ESA had the financial resources to train hotel staff to identify the signs of sex trafficking.

86.     At all relevant times, G6 had the financial resources to train hotel staff to identify the signs of sex trafficking.

87.     At all relevant times, Wyndham had the financial resources to train hotel staff to identify the signs of sex trafficking.

88.     At all relevant times, Choice had the financial resources to train hotel staff to identify the signs of sex trafficking.

89.     At all relevant times, Best Western had the authority to require that training of hotel staff to identify the signs of sex trafficking take place at its brand hotels, including at the Best Western® brand hotel.

90.     At all relevant times, Marriott had the authority to require that training of hotel staff to identify the signs of sex trafficking take place at its brand hotels, including at the Fairfield Inn® hotel.

91.     At all relevant times, ESA had the authority to require that training of hotel staff to identify the signs of sex trafficking take place at its brand hotels, including at the Extended Stay America® hotel.

92.     At all relevant times, G6 had the authority to require that training of hotel staff to identify the signs of sex trafficking take place at its brand hotels, including at the Studio 6® hotel.

93.     At all relevant times, Wyndham had the authority to require that training of hotel staff to identify the signs of sex trafficking take place at its brand hotels, including at the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels.

94.     At all relevant times, Choice had the authority to require that training of hotel staff to identify the signs of sex trafficking take place at its brand hotels, including at the Quality Inn® hotels.

95.     From check-in to check-out, there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, each Defendant could have prevented and identified regular sex trafficking under its respective brand flag.

96.     Obvious signs of sex trafficking at each Defendants' brand hotels included: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting multiple rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[13]

97.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[14]  For this reason, hospitality companies, including each Defendants, are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the operating hotel level.

98.     Hospitality companies, including each Defendant, can and should mandate that *all* staff working at *all* hotel properties across their brands complete sex trafficking training.[15]

---

[13] *Id. See also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[14] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[15] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

99.     In 2008, 18 U.S.C. § 1595 effectively required all companies with a peculiar proximity to human trafficking for commercial sex, including each Defendant, to use reasonable measures and conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures.

100.     The hospitality industry, including each Defendant, have been cognizant of their role and responsibilities in the sex trafficking industry for years.

101.     In 2012, an anti-trafficking coalition alerted Choice Hotels, Accor, Best Western, Hilton, Hyatt, Intercontinental Hotels Group, Marriott, Starwood, and Wyndham of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[16]

102.     Marriott knew, as of at least early 2006, that human trafficking for commercial sex was occurring in its hotels and across its brand.  Because of this, Marriott amended its Human Rights Policy as early as 2006 to require annual review of its policy.  To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking for commercial sex awareness and prevention." [17]

103.     Further, nationwide campaigns that each Defendant was the target of, and subject to, recognized the issue of human trafficking for commercial sex in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland

---

[16] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).
[17] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

Security's Blue Campaign.[18]  These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking for commercial sex, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking for commercial sex.[19]

104.    The presence of sex trafficking and exploitation in hotels is an obvious occurrence and although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published for the hotel industry over the last decade to help hotel staff in every position to identify the signs.[20]

105.    Best Western has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors, including those discussed above for years.

106.    Marriott has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors, including those discussed above for years.

107.    ESA has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors, including those discussed above for years.

108.    G6 has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors, including those discussed above for years.

---

[18]    *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[19]    *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).
[20]    DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue- campaign/toolkits/hospitality-toolkit-eng.pdf.

109.    Wyndham has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors, including those discussed above for years.

110.    Choice has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors, including those discussed above for years.

111.    For years, Best Western has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking for commercial sex in its brand hotels and the most effective means in which that sex trafficking could be stopped.

112.    For years, Marriott has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking for commercial sex in its brand hotels and the most effective means in which that sex trafficking could be stopped.

113.    For years, ESA has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking for commercial sex in its brand hotels and the most effective means in which that sex trafficking could be stopped.

114.    For years, G6 has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking for commercial sex in its brand hotels and the most effective means in which that sex trafficking could be stopped.

115.    For years, Wyndham has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking for commercial sex in its brand hotels and the most effective means in which that sex trafficking

27

could be stopped.

116.     For years, Choice has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking for commercial sex in its brand hotels and the most effective means in which that sex trafficking could be stopped.

117.     Despite its knowledge of sex trafficking in its brand hotels and efforts undertaken or laid out by others to stop such trafficking, Best Western did nothing to stop the sex trafficking at its hotels.

118.     Despite its knowledge of sex trafficking in its brand hotels and efforts undertaken or laid out by others to stop such trafficking, Marriott did nothing to stop the sex trafficking at its hotels.

119.     Despite its knowledge of sex trafficking in its brand hotels and efforts undertaken or laid out by others to stop such trafficking, ESA did nothing to stop the sex trafficking at its hotels.

120.     Despite its knowledge of sex trafficking in its brand hotels and efforts undertaken or laid out by others to stop such trafficking, G6 did nothing to stop the sex trafficking at its hotels.

121.     Despite its knowledge of sex trafficking in its brand hotels and efforts undertaken or laid out by others to stop such trafficking, Wyndham did nothing to stop the sex trafficking at its hotels.

122.     Despite its knowledge of sex trafficking in its brand hotels and efforts undertaken or laid out by others to stop such trafficking, Choice did nothing to stop the sex trafficking at its hotels.

123.    When Best Western eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only but utterly lacking in substance.

124.    When Marriott eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only but utterly lacking in substance.

125.    When ESA eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only but utterly lacking in substance.

126.    When G6 eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only but utterly lacking in substance.

127.    When Wyndham eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only but utterly lacking in substance.

128.    When Choice eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only but utterly lacking in substance.

129.    Hospitality companies, including each Defendant, have both the power and responsibility to make sex trafficking difficult for the offenders.  Yet, each Defendant either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, they continue to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

**B.     THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY**

130.    Hotel brands or flags, including each Defendant, lend their name and likeness to third party owners, while a franchisee or a third party management company under the brands' direction and control runs the building and operations.  In return, the parent brand company exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement, and profits from room rentals.

131.    The average consumer does not see this relationship.  The brand hotel, including each Defendant, gives the property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the brand hotel, including each Defendant.  The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

132.    In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand hotel provides the operating hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs, and a website.  Thus, booking and room reservations are controlled by the brand hotel, including each Defendant.[21]

133.    Upon information and belief, the Best Western® hotel typically pays around 10% of their total revenue back to Best Western and is required to develop and maintain the property in accordance with Best Western's brand standards, as are included in the franchise agreement.

134.    Upon information and belief, per the contract or franchise agreement, Best Western may enforce these standards through periodic inspections and even termination of the agreement if the operating hotel, including the Best Western® hotel, is found to be inadequate. The right of Best Western, as the brand hotel, to enforce their brand standards is also their responsibility.

135.    Upon information and belief, the Fairfield Inn® hotel typically pays around 10% of their total revenue back to Marriott and is required to develop and maintain the property in accordance with Marriott's brand standards, as are included in the franchise agreement.

---

[21] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

136.   Upon information and belief, per the contract or franchise agreement, Marriott may enforce these standards through periodic inspections and even termination of the agreement if the operating hotel, including the Fairfield Inn® hotel, is found to be inadequate.  The right of Marriott, as the brand hotel, to enforce their brand standards is also their responsibility.

137.   Upon information and belief, the Extended Stay America® hotel typically pays around 10% of their total revenue back to ESA and is required to develop and maintain the property in accordance with ESA's brand standards, as are included in the franchise agreement.

138.   Upon information and belief, per the contract or franchise agreement, ESA may enforce these standards through periodic inspections and even termination of the agreement if the operating hotel, including the Extended Stay America® hotel, is found to be inadequate.  The right of ESA, as the brand hotel, to enforce their brand standards is also their responsibility.

139.   Upon information and belief, the Studio 6® hotel typically pays around 10% of their total revenue back to G6 and is required to develop and maintain the property in accordance with G6's brand standards, as are included in the franchise agreement.

140.   Upon information and belief, per the contract or franchise agreement, G6 may enforce these standards through periodic inspections and even termination of the agreement if the operating hotel, including the Studio 6® hotel, is found to be inadequate.  The right of G6, as the brand hotel, to enforce their brand standards is also their responsibility.

141.   Upon information and belief, the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels typically pay around 10% of their total revenue back to Wyndham and is required to develop and maintain the property in accordance with Wyndham's brand standards, as are included in the franchise agreement.

142.    Upon information and belief, per the contract or franchise agreement, Wyndham may enforce these standards through periodic inspections and even termination of the agreement if the operating hotel, including the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels, are found to be inadequate.  The right of Wyndham, as the brand hotel, to enforce their brand standards is also their responsibility.

143.    Upon information and belief, the Quality Inn® hotel typically pays around 10% of their total revenue back to Choice and is required to develop and maintain the property in accordance with Choice's brand standards, as are included in the franchise agreement.

144.    Upon information and belief, per the contract or franchise agreement, Choice may enforce these standards through periodic inspections and even termination of the agreement if the operating hotel, including the Quality Inn® hotel, is found to be inadequate.  The right of Choice, as the brand hotel, to enforce their brand standards is also their responsibility.

145.    At the time of the incidents alleged herein:

    a.  Best Western owned and controlled the Best Western® brand.

    b.  Wyndham owned and controlled the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, Howard Johnson® brands.

    c.  ESA owned and controlled the Extended Stay America® brand.

    d.  G6 owned and controlled the Studio 6® brand.

    e.  Choice owned and controlled the Quality Inn® brand.

    f.  La Quinta Holdings, Inc. owned and controlled the La Quinta® brand.[22]

    g.  Marriott owned and controlled the Fairfield Inn® brand.

146.    Best Western could have kicked the Best Western® hotel out of their system as delinquent but it would have been done at the expense of terminating their royalty payments and

---

[22] La Quinta Holdings, Inc. is now a wholly owned subsidiary of Defendant Wyndham Hotels and Resorts, Inc.

room rental profits, so it was not done.

147.    Marriott could have kicked the Fairfield Inn® hotel out of their system as delinquent but it would have been done at the expense of terminating their royalty payments and room rental profits, so it was not done.

148.    ESA could have kicked the Extended Stay America® hotel out of their system as delinquent but it would have been done at the expense of terminating their royalty payments and room rental profits, so it was not done.

149.    G6 could have kicked the Studio 6® hotel out of their system as delinquent but it would have been done at the expense of terminating their royalty payments and room rental profits, so it was not done.

150.    Wyndham could have kicked the Baymont Inn® Super 8®, Microtel®, Wingate Hotel®, Days Inn®, Howard Johnson® hotels out of their system as delinquent but it would have been done at the expense of terminating their royalty payments and room rental profits, so it was not done.

151.    Choice could have kicked the Quality Inn® hotel out of their system as delinquent but it would have been done at the expense of terminating their royalty payments and room rental profits, so it was not done.

## C.  THE DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR BRANDED HOTELS

152.    Defendants Best Western, G6, ESA, Choice, Marriott, and Wyndham have been on notice of repeated incidences of sex trafficking occurring across their Best Western®, Baymont Inn®, Super 8®, Microtel®, Days Inn®, Howard Johnson®, Wingate Hotel®, La Quinta®, Studio 6®, Extended Stay America®, Quality Inn®, and Fairfield Inn® hotels, yet these brand hotels failed to take the necessary action to prevent sex trafficking at their brand hotels.

153. Best Western:

    a. Best Western controls, owns, supervises, or operates the Best Western® located at 201 West Loop 820 North in Fort Worth and at 2075 North State Highway 360 in Grand Prairie, Texas.

    b. Founded in 1946, Best Western represents that they have more than seventy-three (73) years of experience in managing successful brands. From all of their Best Western® brand hotels, Best Western receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

    c. Best Western knew or should have known that the Best Western® brand hotels where Plaintiff E.S. was trafficked for commercial sex were in areas known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff E.S. was trafficked.

    d. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Best Western has repeatedly failed to thwart these activities.

    e. Best Western can exercise control over Best Western® hotels by:

        i. distributing information to assist employees in identifying human trafficking;

        ii. providing a process for escalating human trafficking concerns within the organization;

        iii. requiring all employees to attend training related to human trafficking;

        iv. providing new hire orientation on human rights and corporate responsibility;

    v.   providing training and education to Best Western® branded hotels through webinars, seminars, conferences, and online portals;

    vi.   developing and holding ongoing training sessions on human trafficking;

    vii.   conducting audits of training protocols; or

    viii.   providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

f.   Best Western is in an actual and/or apparent agency relationship with its Best Western® hotels offering public lodging services. This agency relationship was created and is maintained through Best Western's exercise of an ongoing and systemic right of control over Best Western® hotels by Best Western's operations, including the means and methods of how Best Western® hotels conduct daily business including:

    i.   hosting online bookings on Defendant Best Western's domain;

    ii.   requiring Best Western® hotels to use Defendant Best Western's customer rewards program;

    iii.   setting parameters on employee wages;

    iv.   making employment decisions;

    v.   advertising for employment;

    vi.   sharing profits;

    vii.   standardized training methods for employees;

    viii.   building and maintaining the facility in a manner specified by Best Western;

   ix. standardized or strict rules of operation;

   x. regular inspection of the facility and operation by Best Western;

   xi. fixing prices; or

   xii. other actions that deprive Best Western® hotels of any independence in business operations.

g. Apparent agency also exists between Best Western and Best Western® hotels. Best Western holds out Best Western® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

h. Given Best Western's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Best Western breached its duties in the following ways:

   i. did not adequately distribute information to employees on identifying human trafficking;

   ii. failed to provide a process for escalating human trafficking concerns within the organization;

   iii. failed to mandate all managers, employees, or owners attend training on identifying human trafficking;

   iv. failed to provide new hire orientation on human rights and corporate responsibility;

   v. failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

   vi. failed to develop, hold, and require ongoing training sessions on human trafficking; or

vii. failed to provide checklists, escalation protocols and information to property management staff, or tracking performance indicators and key metrics on human trafficking prevention.

i. For years, Best Western has demonstrated willful blindness to the rampant sex trafficking occurring throughout its Best Western® brand across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff E.S. at a Best Western® that forms the basis for this complaint.

i. In February 2009, six (6) arrests were made for sex trafficking at a Best Western® in Clackamas, Oregon.[23]

ii. In May 2011, a man was arrested and criminally charged for sex trafficking a fifteen (15) year old girl at a Best Western® in Quincy, Massachusetts.[24]

iii. In December 2013, a man was arrested for trafficking women out of a Best Western® in Rockville, Maryland.[25]

iv. In 2014, the city of Columbus, Ohio brought a nuisance claim for allowing drug deals and sex trafficking at a Best Western® in Columbus, Ohio[26]

v. In February 2015, a man was arrested for running a sex trafficking operation out of a Best Western® in Roseville, California.[27]

vi. In July 2015, a man was arrested for trafficking women out of a Best

---

[23] https://www.oregonlive.com/clackamascounty/2009/02/girl_17_found_in_clackamas_pro.html
[24] http://archive.boston.com/news/local/massachusetts/articles/2011/05/21/man_charged_with_abducting_teen_and_forcing_her_into_prostitution/.
[25] https://www.nbcwashington.com/news/local/Inmate-May-Have-Run-Prostitution-Ring-From-Jail-236453261.html
[26] https://www.youtube.com/watch?v=tQ0avWxGHsI
[27] http://www.thepresstribune.com/article/2/06/15/roseville-police-.

Western® in King of Prussia, Pennsylvania.[28]

vii.   In December 2015, a man was arrested for trafficking a 15 year-old out of a Best Western® in South Plainfield, New Jersey.[29]

viii.   In December 2016, two (2) men were arrested for sex trafficking women out of a Best Western® in Nashville, Tennessee.[30]

ix.   In May 2016, thirty-three (33) individuals, including two (2) pastors were arrested on prostitution and trafficking charges for trafficking minors out of a Best Western® in Knoxville, Tennessee.[31]

x.   In September 2016, a man was arrested at a Best Western® in Bensalem, Pennsylvania for trafficking four women. [32]

xi.   In April 2017, two (2) people were arrested for sex trafficking a minor at a Best Western® in Denton, Maryland.[33]

xii.   In July 2017, a man was arrested after trafficking three minors at a Best Western® in Woodlawn, Maryland.[34]

xiii.   In October 2017, a sixteen (16) year old girl was rescued from a Best Western® in Arlington, Virginia, where she was being sex trafficked.[35]

xiv.   In December 2018, a husband and wife were arrested for engaging in an interstate sex trafficking scheme at a Best Western® in Portsmouth, New Hampshire.[36]

---

[28] https://patch.com/pennsylvania/norristown/norristown-area-prostitution-sentencings-are-tuesday-0
[29] https://www.nj.com/union/2015/12/plainfield_man_who_recruited_girl_for_prostitution.html
[30] https://fox17.com/community/nashville-neighborhood-watch/man-swallows-marijuana-cigarette-during-nashvilleprostitution-sting-at-hotel
[31] https://www.wspa.com/news/2-pastors-charged-with-human-trafficking-among-32-arrested-during-sting/1018484391
[32] https://patch.com/pennsylvania/bensalem/pimp-who-ran-prostitution-operation-bensalem-motel-headed-state-prison
[33] https://www.wmdt.com/2017/04/two-facing-human-trafficking-charges-for-reportedly-prostituting-child-fromdenton-hotel/
[34] https://www.baltimoresun.com/news/maryland/crime/bs-md-matthew-brown-sentencing-20170720-story.html
[35] https://www.wusa9.com/article/news/local/2-men-plead-guilty-to-two-different-child-sex-traffickingoperations/484712778
[36] https://www.seacoastonline.com/news/20181214/husband-wife-charged-in-sex-trafficking-prostitution-scheme

xv. In March 2018, a man was investigated for recruiting high school students to participate in his sex trafficking ring. Police arrested him and at a Best Western® in Oklahoma City, Oklahoma with a woman he was selling for sexual favors.[37]

154. G6:

a. G6 controls, owns, supervises, or operates the Studio 6® hotel located at 1980 West Pleasant Ridge Road in Arlington, Texas.

b. G6 Hospitality failed to implement and enforce any of their own policies and protect Plaintiff E.S. from being trafficked.

c. Founded in 1962, G6 Hospitality represents that they have more than fifty-seven years of experience in managing successful brands. From all of their Studio 6® properties, G6 receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

d. G6 knew or should have known that the Studio 6® hotel where Plaintiff E.S. was trafficked for commercial sex was in an area known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff E.S. was trafficked.

e. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, G6 has repeatedly failed to thwart these activities.

f. G6 can exercise control over Studio 6® hotels by:

---

[37] https://www.edmondsun.com/news/prostitution-ring-targets-santa-fe-students/article_e07be414-23f2-11e8-9b32-ffcbb9a0f9aa.html

i.   distributing information to assist employees in identifying human trafficking;

ii.  providing a process for escalating human trafficking concerns within the organization;

iii. requiring all employees to attend training related to human trafficking;

iv.  providing new hire orientation on human rights and corporate responsibility;

v.   providing training and education to Studio 6® hotels through webinars, seminars, conferences, and online portals;

vi.  developing and holding ongoing training sessions on human trafficking;

vii. conducting audits of training protocols; or

viii.   providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

g.  G6 is in an actual and/or apparent agency relationship with its Studio 6® hotels offering public lodging services. This agency relationship was created and is maintained through G6's exercise of an ongoing and systemic right of control over Studio 6® hotels by G6's operations, including the means and methods of how Studio 6® hotels conduct daily business including:

i.   hosting online bookings on G6's domain;

ii.  requiring Studio 6® hotels to use G6's customer rewards program;

iii. setting parameters on employee wages;

40

    iv.  making employment decisions;

    v.   advertising for employment;

    vi.  sharing profits;

    vii. standardized training methods for employees;

    viii. building and maintaining the facility in a manner specified by G6;

    ix.  standardized or strict rules of operation;

    x.   regular inspection of the facility and operation by G6;

    xi.  fixing prices; or

    xii. other actions that deprive Studio 6® hotels of any independence in their business operations.

h.  Apparent agency also exists between G6 and Studio 6® hotels. G6 holds out Studio 6® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

i.  Given G6's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, G6 breached its duties in the following ways:

    i.   Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

    ii.  Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

    iii. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

41

    iv. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

    v. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

    vii. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

j. For years, G6 has demonstrated willful blindness to the rampant sex trafficking occurring throughout its Studio 6® hotels across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff E.S. at the Studio 6® hotel which forms the basis for this complaint.

    i. In August 2016, two traffickers are arrested after forcing a woman to meet an undercover officer for sex at a Studio 6 in Tulsa, Oklahoma.[38]

    ii. In April 2018, a man pled guilty to sex trafficking for luring a woman to a Studio 6 in Tyler, Texas, placing ads for her online,

---

[38] https://ktul.com/news/local/prostitution-sting-leads-to-two-human-trafficking-arrests-in-tulsa

and then forcing her to perform sex acts with multiple clients for money for about 16 to 19 hours a day.[39]

iii.  In October 2017, law enforcement executed a search warrant which alleged that two men brought two runaways from a West Palm Beach group home to the Studio 6 motel in West Palm Beach, Florida, and forced the juveniles to perform sex acts for money.[40]

iv.  In February 2018, police found an advertisement for a runaway girl on a sex trafficking website and were able to rescue her from a Studio 6 in Austin, Texas.[41]

v.  In July 2012, a man pled to federal criminal charges for recruiting a 16-year-old victim from a foster-care program then forcing her to meet customers for sex at a Studio 6 in Jacksonville, Florida, repeatedly renting rooms on the first and second floor.[42]

vi.  In June 2017, two juvenile girls, who were trafficked out of a Studio 6 in Oklahoma City, were rescued by police.[43]

i.  In July 2012, a Tripadvisor reviewer who stayed at the Studio 6 on Watson Rd in Arlington, Texas wrote, "The first night there was no key because the card machine was broken, the second night no internet. The third night there was loud parties until 3 a.m. on a Thursday night. I felt like I was in a hot bed of criminal activity

---

[39] https://tylerpaper.com/judge-finds-tyler-man-guilty-of-sex-trafficking/article_bf77e59e-3d9a-5064-b6c7-e57dd216301e.html
[40] https://www.wptv.com/news/region-c-palm-beach-county/west-palm-beach/tampa-search-warrant-reveals-juveniles-being-recruited-in-west-palm-beach-for-sex-trafficking
[41] https://www.kvue.com/article/news/crime/suspect-arrested-after-sex-trafficking-a-girl-in-austin-police-say/269-521498947
[42] https://www.news4jax.com/news/2012/07/07/feds-man-recruited-foster-care-girls-for-prostitution/
[43] https://okcfox.com/news/local/18-year-old-arrested-accused-of-prostituting-two-juveniles

and I was only there on weekdays. The staff was very nice and I feel sorry for them. I won't go back." [44]

ii. In July 2018, a contributor to Trip advisor stated, "Worst hotel ever. Hookers, bums, bugs, and rude staff. So if you like those things along with a broken back door. Maybe you and your loved ones will enjoy your time if that's your thing, syringes in the parking lot. I could not believe how bad this place is. Glad we had the pistol." [45]

155.   Wyndham:

a. Defendant Wyndham controls, owns, supervises, or operates the La Quinta® hotels located at 4900 Bryant Irvin Rd, Fort Worth, TX 76132, 4001 Scots Legacy Drive in Arlington and 4700 North Freeway in Fort Worth, Texas.

b. Wyndham, as La Quinta Holdings, Inc., failed to implement and enforce any of their own policies and protect Plaintiff E.S. from being trafficked.

c. Founded in 1968, La Quinta Holdings, Inc. had more than fifty (50) years of experience in managing successful brands, and founded in 1981, Wyndham has more than thirty-eight (38) years of experience. From all of their La Quinta® properties, Defendant Wyndham receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits as La Quinta Holdings, Inc. once did.

d. Defendant Wyndham, as La Quinta Holdings Inc., knew or should have

---

[44] https://www.tripadvisor.com/Hotel_Review-g30183-d98395-Reviews-Studio_6_Arlington-Arlington_Texas.html)
[45] https://www.tripadvisor.com/ShowUserReviews-g30183-d98395-r594663439-Studio_6_Arlington-Arlington_Texas.html)

known that the La Quinta® where Plaintiff E.S. was trafficked for commercial sex was an area known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff E.S. was trafficked.

e.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Wyndham, as La Quinta Holdings, Inc., has repeatedly failed to thwart these activities.

f.  Defendant Wyndham can exercise control over La Quinta® hotels by:

   i.  distributing information to assist employees in identifying human trafficking;

   ii.  providing a process for escalating human trafficking concerns within the organization;

   iii.  requiring all employees to attend training related to human trafficking;

   iv.  providing new hire orientation on human rights and corporate responsibility;

   v.  providing training and education to La Quinta® branded hotels through webinars, seminars, conferences, and online portals;

   vi.  developing and holding ongoing training sessions on human trafficking;

   vii.  conducting audits of training protocols; or

   viii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators

45

and key metrics on human trafficking prevention.

g.  Defendant Wyndham, as La Quinta Holdings, Inc., is in an agency relationship with its La Quinta® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant Wyndham's exercise of an ongoing and systemic right of control over La Quinta® hotels by Defendant Wyndham's operations, including the means and methods of how La Quinta® hotels conduct daily business including:

   i.   hosting online bookings on Defendant Wyndham's domain;

   ii.  requiring La Quinta® hotels to use Defendant Wyndham's customer rewards program;

   iii. setting parameters on employee wages;

   iv.  making employment decisions;

   v.   advertising for employment;

   vi.  sharing profits;

   vii. standardized training methods for employees;

   viii. building and maintaining the facility in a manner specified by Hyatt;

   ix.  standardized or strict rules of operation;

   x.   regular inspection of the facility and operation by Hyatt;

   xi.  fixing prices; or

   xii. other actions that deprive La Quinta® hotels of any independence in their business operations.

h. Apparent agency also exists between Defendant Wyndham, as La Quinta Holdings, Inc., and La Quinta® hotels. Defendant Wyndham holds out La Quinta® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

i. Given public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Wyndham, as La Quinta Holdings, Inc., breached its duties in the following ways:

    i. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

    ii. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

    iii. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

    iv. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

    v. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

    vii. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or

tracking performance indicators and key metrics on human trafficking prevention.

j. For years, La Quinta Holdings, Inc., has demonstrated willful blindness to the rampant sex trafficking occurring throughout its La Quinta® brand across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff E.S. at a La Quinta® that forms the basis for this complaint and the successor liability Defendant Wyndham now faces.

   i. In March 2015, a Sergeant 1st Class was investigated for trafficking a woman in his battalion out of a La Quinta® in Killeen, Texas.[46]

   ii. In March 2017, three (3) men were arrested at a La Quinta® in Ventura, California for sexually trafficking a minor. [47]

   iii. In November 2017, a man and a woman were arrested at a La Quinta® in Panama City, Florida for sex trafficking another woman out of the same hotel.[48]

   iv. In December 2017, a man was arrested for trafficking a woman out of a La Quinta® in Panama City, Florida.[49]

   v. In May 2018, the manager of a La Quinta® in Tuscaloosa, Alabama was arrested for allowing human trafficking at the hotel. Police unveiled that the manager was financially profiting from sex

---

[46] https://www.thedailybeast.com/inside-fort-hoods-prostitution-ring
[47] https://www.10news.com/news/3-men-arrested-accused-of-human-trafficking-forcing-teen-into-prostitution-in-san-diego
[48] https://www.newsherald.com/news/20171126/pcpd-pair-charged-with-human-trafficking-forced-prostitution
[49] https://www.wtvy.com/content/news/Dothan-man-accused-of-forcing-person-into-prostitution-in-Panama-City-467034463.html

traffickers that used her hotel.[50]

vi. In June 2018, a man was arrested for trafficking two (2) minor girls and holding them against their will at a La Quinta® in Norcross, Georgia.[51]

vii. In October 2018, a man was arrested after he coerced a deaf woman into a relationship with him only to sell her for sex at a La Quinta® in Austin, Texas.[52]

viii. In November 2018, a man was arrested for trafficking a sixteen (16) year old girl for sex at a La Quinta® in Springdale, Ohio.[53]

ix. In December 2018, a number of Chinese women were being sexually trafficked by a married couple through a La Quinta® in South Burlington, Vermont. [54]

x. An April 2018 report showed hotels in the Hudson Valley that have high rates of sex trafficking and the La Quinta® in Westchester, New York had thirty-seven (37) trafficking calls in 24 months.[55]

xi. In April 2019, a man trafficked a minor through a La Quinta® in Sarasota, Florida.

k. Defendant Wyndham also controls, owns, supervises, or operates the the Baymont Inn® hotel located at 2401 Diplomacy Drive in Arlington, the

---

[50] https://www.tuscaloosanews.com/news/20180517/tuscaloosa-police-charge-laquinta-inn-manager-with-human-trafficking
[51] https://www.ajc.com/news/local/gwinnett-man-charged-with-trafficking-children-for-sex-labor/hqGlERVvMI3q0uC4PEUO6O/
[52] https://www.kxan.com/news/local/austin/man-arrested-for-allegedly-forcing-a-deaf-woman-into-prostitution/1515032988
[53] https://www.wcpo.com/news/crime/man-found-guilty-of-trafficking-underage-girl-for-sex
[54] https://www.wcax.com/content/news/NH-couple-accused-of-enticing-Chinese-into-sex-trafficking-502787462.html
[55] http://westchester.news12.com/story/38003438/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley

Super 8® hotels located at 1905 West Pleasant Ridge Road and at 2710 East Abram Street in Arlington, the Microtel® hotel located at 1901 Pendleton Drive in Garland, the Wingate® hotel located at 8650 North Stemmons Freeway in Dallas, the Days Inn® hotel located at 1901 West Pleasant Ridge Road in Arlington, and the Howard Johnson® hotel located at 2001 East Copeland Road in Arlington, Texas.

l.   Wyndham failed to implement and enforce any of their own policies and protect Plaintiff E.S. from being trafficked.

m.  Founded in 1981, Wyndham represents that they have more than thirty-seven years of experience in managing successful brands. From all of their Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels, Defendant Wyndham receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

n.   Defendant Wyndham knew or should have known that the Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels where Plaintiff E.S. was trafficked for commercial sex were in areas known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff E.S. was trafficked.

o.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Wyndham has repeatedly failed to thwart these activities.

p.  Defendant Wyndham can exercise control over Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels by:

    i.  distributing information to assist employees in identifying human trafficking;

    ii.  providing a process for escalating human trafficking concerns within the organization;

    iii.  requiring all employees to attend training related to human trafficking;

    iv.  providing new hire orientation on human rights and corporate responsibility;

    v.  providing training and education to Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels through webinars, seminars, conferences, and online portals;

    vi.  developing and holding ongoing training sessions on human trafficking;

    vii.  conducting audits of training protocols; or

    viii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

q.  Defendant Wyndham is in an apparent and/or actual agency relationship with its Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels offering public lodging services. This agency

relationship was created and is maintained through Defendant Wyndham's exercise of an ongoing and systemic right of control over Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels by Defendant Wyndham's operations, including the means and methods of how Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels conduct daily business including:

 i. hosting online bookings on Defendant Wyndham's domain;

 ii. requiring Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels to use Defendant Wyndham's customer rewards program;

 iii. setting parameters on employee wages;

 iv. making employment decisions;

 v. advertising for employment;

 vi. sharing profits;

 vii. standardized training methods for employees;

 viii. building and maintaining the facility in a manner specified by Wyndham,

 ix. standardized or strict rules of operation;

 x. regular inspection of the facility and operation by Wyndham;

 xi. fixing prices; or

 xii. other actions that deprive Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels of any independence in their business operations.

r.  Apparent agency also exists between Defendant Wyndham and Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels. Defendant Wyndham holds out Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

s.  Given Defendant Wyndham's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Wyndham breached its duties in the following ways:

    i.  Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

    ii.  Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

    iii.  Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

    iv.  Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

    v.  Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi.  Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

vii. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

t.  For years, Defendant Wyndham has demonstrated willful blindness to the rampant sex trafficking occurring throughout its Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff E.S. at Baymont Inn®, Super 8®, Microtel®, Wingate Hotel®, Days Inn®, and Howard Johnson® hotels that forms the basis for this complaint.

156.  BAYMONT INN®

a.  In August of 2017, a reviewer described the Baymont Inn® by Wyndham in Meridian, Mississippi as follows: "There were obvious permanent residents in the back, of which one offered one of our people crack and were talking about having prostitutes over smoking crack and weed to cover up the smell of crack." [56]

b.  In November of 2018, the owner of the Baymont Inn® in Manchester, Connecticut was arrested for sex trafficking minors. [57]

c.  In October of 2015, a reviewer described the Baymont Inn® in Houston, Texas as follows: "Hookers, hookers and more hookers! Don't forget the drug activity too! Stayed here one night as I had an early flight out of

---

[56] https://www.tripadvisor.com/ShowUserReviews-g43893-d235304-r511959496 Baymont_by_Wyndham_Meridian-Meridian_Mississippi.html
[57] https://patch.com/connecticut/vernon/vernon-office-raided-hotel-owner-charged-prostitution-case

Hobby the next morning! Big mistake! As I was checking in, some pimp named Big D tried to get my wife to join his brigade!" [58]

d. In October of 2016, a reviewer described the Baymont Inn® in Orlando, Florida as follows: "To begin my terrible experience at this hotel, I was greeted by a real life prostitute waiting to pick up some business on the sidewalk directly in front of the hotel! After we pulled in to park we see her PIMP hiding behind some UHAUL truck who kept poking his head out while we unpacked our things from the car." [59]

e. In December of 2015, a man and a woman were arrested at a Baymont Inn® in Murfreesboro, Tennessee for sex trafficking. [60]

157.  SUPER 8®

a. In August 2012, the Central Ohio Human Trafficking Task Force completed an investigation which resulted in indictments of several persons charged with human trafficking which occurred at the Super 8® on Dublin-Granville Road in Columbus, Ohio as well as other locations.[61]

b. In September 2013, a trafficker took a 17- year old girl to a Super 8® in West Greenwich, Rhode Island and ultimately pled guilty to federal sex trafficking charges for his criminal conduct.[62]

---

[58] https://www.yelp.com/biz/baymont-inn-houston-houston
[59] https://www.tripadvisor.com/Hotel_Review-g34515-d217364-Reviews-Baymont_by_Wyndham_Florida_Mall-Orlando_Florida.html#REVIEWS
[60] https://www.wgnsradio.com/prostitute-and-alleged-pimp-arrested-in-murfreesboro-cms-30412&cache_id=5150
[61] John Futty, *Secret panel on human trafficking wins indictments*. THE COLUMBUS DISPATCH (Aug. 3, 2012, 8:56 AM), https://www.dispatch.com/content/stories/local/2012/08/03/secret-panel-on-human-trafficking-wins-indictments.html
[62] Michael P. McKinney, *Missouri man pleads guilty to sex trafficking for bringing 17-year-old Massachusetts girl to Rhode Island*, PROVIDENCE JOURNAL (Feb 27, 2014, 12:01 AM), https://www.providencejournal.com/breaking-news/content/20140227-missouri-man-pleads-guilty-to-sex-trafficking-for-bringing-17-year-old-massachusetts-girl-to-rhode-island.ece

c.  In June 2014, federal authorities charged a man with human trafficking after arresting him at a Super 8® in Wyoming, Michigan where he had taken a 15-year old girl.[63]

d.  In July 2016, an undercover federal agent discovered 2 girls ages 18 and 15 at a Super 8® in El Paso, Texas and charged their trafficker with 2 counts of sex trafficking children by force.[64]

e.  In October 2016, 2 men were arrested at a Super 8® in Frederick, Maryland and were charged with human trafficking-related offenses in relation to their crimes against a juvenile victim.[65]

f.  From February 2016 through October 2017, a sex trafficking ring operated out of a Super 8® in Fort Worth, Texas and trafficked at least five (5) juveniles.[66]

g.  In June 2017, authorities busted a sex trafficking operation at a Super 8® in Lakeland, Tennessee, and rescued a 19-year old girl who was being held against her will and sold for sex.[67]

h.  In July 2018, an investigation on the premises of a Super 8® in Columbus, Georgia led to human trafficking charges against multiple suspects.[68]

---

[63] Barton Deiters, *Man accused of human trafficking of 15-year-old girl in Wyoming*, MLIVE (Jun. 24, 2014), https://www.mlive.com/news/grand-rapids/index.ssf/2014/06/man_accused_of_human_trafficki.html
[64] Aaron Martinez, *Man pleads guilty in underage sex trafficking case*, EL PASO TIMES (Apr 21, 2017), https://www.elpasotimes.com/story/news/2017/04/21/man-pleads-guilty-sex-trafficking-case/100754896/
[65] *Two charged in Maryland with Rape, Human Trafficking, Others*, NBC WASHINGTON (Oct. 1, 2016, 7:20 AM), https://www.nbcwashington.com/news/local/Two-Charged-in-Maryland-with-Rape-Human-Trafficking-Others-395505801.html
[66] Domingo Ramirez Jr., *Statewide sex-trafficking ring operating in Fort Worth shut down with eight arrests*, FORT WORTH STAR-TELEGRAM (Oct. 17, 2017, 2:36 PM), https://www.star-telegram.com/news/local/community/fort-worth/article179323426.html
[67] *Sex trafficking operation busted at Super 8 in Lakeland*, WMC ACTION NEWS 5 (Jun 13, 2017, 9:41 PM), http://www.wmcactionnews5.com/story/35657458/sex-trafficking-operation-busted-at-super-8-in-lakeland/
[68] Ben Wright, *Threesome and drugs: Escorting app leads to human trafficking charges, Columbus police say*, LEDGER-ENQUIRER (Jul. 12, 2018, 12:00 AM), https://www.ledger-enquirer.com/latest-news/article214760585.html

i.   In August 2018, a 16-year old victim of human trafficking was rescued from a Super 8® in Duson, Louisiana.[69]

j.   In September 2018, a former member of the Oklahoma state legislature was sentenced to 15 years in prison on charges of child sex trafficking after he was found in a room at a Super 8®, with a 17-year old boy.[70]

158.   MICTROTEL ®

a.   In October 2017, a 16-year-old girl was rescued from a Microtel® in Raleigh, North Carolina where she was being held by a man who was prostituting her from the location. The man was a known sex trafficker.[71]

b.   In June of 2013, a man was charged with trafficking an eighteen year old girl at a Microtel® in Raleigh, North Carolina. [72]

159.   DAYS INN®

a.   In February 2019, a man ran a human trafficking operation out of a Days Inn® in Madison Heights, Michigan.[73]

b.   In August 2018, four people were arrested for trafficking a 15-year old girl out of a Days Inn® in Marietta, Georgia. They kept the young girl in captivity by threatening to kill her if she tried to escape.[74]

c.   In October 2015, a man prostituted women out of a Days Inn® in Reading, Pennsylvania. He controlled the women with drugs and set up sexual encounters.[75]

---

[69] Lester Duhe, *Authorities investigate human trafficking case involving 16 year old boy*, KLFY (Aug. 13, 2018, 6:48 PM), https://www.klfy.com/news/local/authorities-investigate-human-trafficking-case-involving-16-year-old-boy/1360573674
[70] *Former Oklahoma state senator sentenced to 15 years on child sex trafficking charge*, NBC (Sept. 17, 2018, 11:24 PM), https://www.nbcnews.com/news/us-news/former-oklahoma-state-senator-sentenced-15-years-child-sex-trafficking-n910516
[71] https://www.newsobserver.com/news/local/crime/article178431461.html
[72] https://www.witn.com/home/headlines/Man-Charged-With-Human-Trafficking-In-Pitt-County-213318591.html
[73] http://www.fox2detroit.com/news/local-news/man-arrested-for-sex-trafficking-out-of-madison-heights-days-inn
https://www.mdjonline.com/news/marietta-sex-trafficking-ring-thwarted-police-say/article_997739c0-a55b-11e8-9647-338800611347.html

d.  In September 2018, a woman was caught sex trafficking two 17-year old girls at a Days Inn® in Fayetteville, North Carolina.[76]

e.  In July 2018, a man used social media websites to coerce a young girl to come to a Days Inn® Gulfport, Mississippi. When she arrived, the man forced her into sexual servitude.[77]

f.  In December 2018, a couple coerced females from China to move to Maine by offering tourist visas. Upon arrival, the couple stripped the women and girls of their identification, advertised them as prostitutes on Craigslist, and forced them to sexually service men at two Days Inn® locations, one in Kittery and the other in Dover, New Hampshire.[78]

g.  In June 2018, three individuals were arrested in a human trafficking scheme at a Days Inn® in Virginia Beach, Virginia.[79]

160.  WINGATE®

a.  In April 2015, a reviewer commented about the Dallas Wingate® Hotel as follows, "Beware! This hotel has prostitutes & pimps everywhere and there is a strip club right across the street. Rough looking individuals outside in the parking lot and in the hallways. This was the scariest hotel experience I have ever had. Desk staff lady was not helpful at all…Security had to check if our room was being used before we could go up." [80]

---

[75] https://www.poconorecord.com/news/20161204/scranton-sex-trafficking-cases-move-forward
[76] https://www.fayobserver.com/news/20180921/fayetteville-woman-charged-in-human-trafficking-operation.
[77] https://www.sunherald.com/news/local/crime/article215055145.html
[78] https://www.seacoastonline.com/news/20181214/husband-wife-charged-in-sex-trafficking-prostitution-scheme
[79] https://www.wavy.com/news/local-news/virginia-beach/three-sex-trafficking-suspects-arrested-by-virginia-beach-police/1213339402
[80] https://www.tripadvisor.com/ShowUserReviews-g55711-d109391-r267425338-Wingate_by_Wyndham_Dallas_Love_Field-

161.   HOWARD JOHNSON®

    a.   In October of 2017, the manager of a Howard Johnson® in Bartonville, Pennsylvania, was arrested for allowing and profiting from drug and sex trafficking within the hotel. [81]

    b.   In August 2017, a women, already under indictment for running a series of brothels throughout Boston, was arrested for trafficking women out of Howard Johnson® hotels in Quincy, Massachusetts. [82]

    c.   In February of 2013, the city attorney ordered a Howard Johnson® in San Diego, California to make immediate changes in security to crack down on sex trafficking. Over the course of the investigation lasting from 2011 to 2013, more than 20 arrests were made, including arrests for pimping and human trafficking.[83]

162.   Marriott:

    a.   Marriott owns, supervises, and/or operates the Fairfield Inn® hotels located at 2500 East Lamar Boulevard in Arlington and at 2110 Market Center Boulevard and North Stemmons Freeway in Dallas, Texas.

    b.   Marriott failed to implement and enforce any of their own policies and protect Plaintiff E.S. from being trafficked.

    c.   Founded in 1927, Marriott represents that they have more than Ninety-two (92) years of experience in managing successful brands. From all of their Fairfield Inn® properties, Defendant Marriott receives an application fee, a

---

Dallas_Texas.html)
[81] https://www.pahomepage.com/news/bartonsville-hotel-operator-charged-with-human-drug-trafficking/
[82] https://www.patriotledger.com/news/20170808/alleged-quincy-brothel-owner-arrested-again-for-sex-trafficking
[83] https://www.nbcsandiego.com/news/local/Mission-Valley-Travelodge-Hotel-Prostitution-Crackdown-243554781.html

lump sum payment, royalties, and other ongoing financial benefits.

d.  Defendant Marriott knew or should have known that the Fairfield Inn and Suites® where Plaintiff E.S. was trafficked for commercial sex was an area known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff E.S. was trafficked.

e.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Marriott has repeatedly failed to thwart these activities.

f.   Defendant Marriott can exercise control over Fairfield Inn® hotels by:

　　i.  distributing information to assist employees in identifying human trafficking;

　　ii.  providing a process for escalating human trafficking concerns within the organization;

　　iii.  requiring all employees to attend training related to human trafficking;

　　iv.  providing new hire orientation on human rights and corporate responsibility;

　　v.  providing training and education to Fairfield Inn and Suites® hotels through webinars, seminars, conferences, and online portals;

　　vi.  developing and holding ongoing training sessions on human trafficking;

　　vii.  conducting audits of training protocols; or

  viii. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

 g. Defendant Marriott is in an apparent and/or actual agency relationship with its Fairfield Inn® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant Marriott's exercise of an ongoing and systemic right of control over Fairfield Inn and Suites® hotels by Defendant Marriott's operations, including the means and methods of how Fairfield Inn and Suites® hotels conduct daily business including:

  i. hosting online bookings on Defendant Marriott's domain;

  ii. requiring Hyatt Place® hotels to use Defendant Marriott's customer rewards program;

  iii. setting parameters on employee wages;

  iv. making employment decisions;

  v. advertising for employment;

  vi. sharing profits;

  vii. standardized training methods for employees;

  viii. building and maintaining the facility in a manner specified by Marriott;

  ix. standardized or strict rules of operation;

  x. regular inspection of the facility and operation by Marriott;

  xi. fixing prices; or

xii.  other actions that deprive Fairfield Inn and Suites® hotels of any independence in their business operations.

h.  Apparent agency also exists between Defendant Marriott and Fairfield Inn and Suites® hotels. Defendant Marriott holds out Fairfield Inn and Suites® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

i.  Given Defendant Marriott's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Marriott breached its duties in the following ways:

   i.  Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

   ii.  Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

   iii.  Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

   iv.  Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

   v.  Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

   vi.  Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

vii. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

j.  For years, Defendant Marriott has demonstrated willful blindness to the rampant sex trafficking occurring throughout its Fairfield Inn® hotels across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff E.S. at a Fairfield Inn® that forms the basis for this complaint.

i.  In February 2017, a woman was sentenced to one count of conspiracy to commit sex trafficking after kidnapping a 17-year-old girl from Topeka, Kansas to Junction City, Kansas in March of 2015 for the purpose of sex trafficking her out of a Fairfield Inn® in Manhattan, Kansas. [84]

ii.  In October 2013, a man was sentenced to five to seven years in state prison for kidnapping two underage girls and forcibly trafficking them in hotel rooms throughout Quincy, Dedham, Dorchester, and Danvers Massachusetts, including a Fairfield Inn® in Dedham. [85]

iii.  In December 2019, an Arkansas man was arrested at a Fairfield Inn® in Springdale, Arkansas after trafficking a woman across Arkansas, Louisiana, and Texas for the purpose of commercial

---

[84] http://www.kake.com/story/34426420/woman-sentenced-in-teen-sex-trafficking-case
[85] https://www.wickedlocal.com/x919096222/Dorchester-man-arrested-in-Quincy-pleads-guilty-to-child-prostitution-charges

sex.[86]

    iv.  In November 2015, a reviewer described the Fairfield Inn® in Washington D.C. as follows, "The clientele was seedy. When my family and I left for dinner and returned I felt like we walked back into a Brothel. It appeared that a pimp was dropping off one of his hookers who was meeting a john. I was done. Between the seedy guests roaming around in this hotel and the other activity going on we all felt grossed out. Whew!!!! Just simply waking from the lobby to my room we felt like we were in a danger zone." The reviewer goes onto say, "We also went with the Fairfield because it had the Marriott name behind it." [87]

    v.  In July of 2018, a pimp named Lamont King was arrested by an undercover officer. The officer was investigating related sex trafficking activity in the area, including the Fairfield Inn® on West 86th Street. [88]

163.    ESA:

    a.  ESA owns, supervises, and/or operates the Extended Stay America® located at 1221 North Watson Road in Arlington, Texas.

    b.  ESA failed to implement and enforce any of their own policies and protect Plaintiff E.S. from being trafficked.

    c.  Founded in 1995, ESA represents that they have more than twenty-three

[86] https://www.arkansasonline.com/news/2019/dec/04/north-little-rock-man-arrested-connection-sex-traf/
[87] https://www.tripadvisor.com/Hotel_Review-g28970-d939375-Reviews-or5-Fairfield_Inn_Suites_Washington_DC_New_York_Avenue-Washington_DC_District_of_Columb.html#REVIEWS
[88] https://www.theindychannel.com/longform/running-blind-impd-arrests-first-suspected-pimp-in-7-months

(23) years of experience in managing successful brands. From all of their Extended Stay America® properties, Defendant ESA receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

d. Defendant ESA knew or should have known that the Extended Stay America® where Plaintiff E.S. was trafficked for commercial sex was an area known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff E.S. was trafficked.

e. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant ESA has repeatedly failed to thwart these activities.

f. Defendant ESA can exercise control over Extended Stay America® hotels by:

i. distributing information to assist employees in identifying human trafficking;

ii. providing a process for escalating human trafficking concerns within the organization;

iii. requiring all employees to attend training related to human trafficking;

iv. providing new hire orientation on human rights and corporate responsibility;

v. providing training and education to Extended Stay America®

hotels through webinars, seminars, conferences, and online portals;

vi. developing and holding ongoing training sessions on human trafficking;

vii. conducting audits of training protocols; or

viii. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

g. Defendant ESA is in an agency relationship with its Extended Stay America® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant ESA's exercise of an ongoing and systemic right of control over Extended Stay America® hotels by Defendant ESA's operations, including the means and methods of how Extended Stay America® hotels conduct daily business including:

i. hosting online bookings on Defendant ESA's domain;

ii. requiring ESA hotels to use Defendant ESA's customer rewards program;

iii. setting parameters on employee wages;

iv. making employment decisions;

v. advertising for employment;

vi. sharing profits;

vii. standardized training methods for employees;

    viii.  building and maintaining the facility in a manner specified by ESA;

    ix.  standardized or strict rules of operation;

    x.  regular inspection of the facility and operation by ESA;

    xi.  fixing prices; or

    xii.  other actions that deprive Extended Stay America® hotels of any independence in their business operations.

h.  Apparent agency also exists between Defendant ESA and Extended Stay America® hotels. Defendant ESA holds out Extended Stay America® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

i.  Given Defendant ESA's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant ESA breached its duties in the following ways:

    i.  did not adequately distribute information to employees on identifying human trafficking;

    ii.  failed to provide a process for escalating human trafficking concerns within the organization;

    iii.  failed to mandate all managers, employees, or owners attend training on identifying human trafficking;

    iv.  failed to provide new hire orientation on human rights and corporate responsibility;

    v.  failed to provide training and education on human trafficking

through webinars, seminars, conferences, and online portals;

vi.  failed to develop, hold, and require ongoing training sessions on human trafficking; or

vii.  failed to provide checklists, escalation protocols and information to property management staff, or tracking performance indicators and key metrics on human trafficking prevention.

j.  For years, Defendant ESA has demonstrated willful blindness to the rampant sex trafficking occurring throughout its Extended Stay America® brand across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff E.S. at an Extended Stay America® that forms the basis for this complaint.

i.  In February of 2019, fourteen men were arrested for human trafficking at an Extended Stay America in Waukegan, Illinois. This was part of a two and a half week long police initiative to crackdown on human trafficking within the area.[89]

ii.  In January of 2017, two men were arrested at an Extended Stay America in Woodbury, WI for trafficking a 31 year-old homeless woman.[90]

iii.  In October of 2017, a Pikesville man was sentenced to four years in prison after trafficking a woman out of an Extended Stay America in Columbia, Maryland.[91]

---

[89] https://patch.com/illinois/deerfield/prostitution-sting-operation-hooks-14-lake-county
[90] https://www.twincities.com/2017/01/12/2-hudson-wis-men-arrested-in-sex-trafficking-scheme-at-woodbury-hotel/
[91] https://foxbaltimore.com/news/local/pikesville-man-gets-4-years-in-jail-for-human-trafficking-at-columbia-hotel

164.   Choice:

   a.   Choice owns, supervises, and/or operates the Quality Inn® hotels located at 121 East Interstate 20 in Arlington, 3891 S Great Southwest Parkway in Grand Prairie, 923 Windbell Circle in Mesquite,  4555 Belt Line Road in Addison, and 10835 Composite Drive in Dallas, Texas.

   b.   Choice failed to implement and enforce any of their own policies and protect Plaintiff E.S. from being trafficked.

   c.   Founded in 1937, Choice was the joint-venture of seven (7) independent hotel owners specifically looking to join forces to share trade knowledge and better determine best practices. Choice represents that they have more than eighty-two (82) years of experience in managing successful brands. From all of their hotels, Choice receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

   d.   Choice knew or should have known that the Quality Inn® where Plaintiff E.S. was trafficked for commercial sex was an area known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff E.S. was trafficked.

   e.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Choice has repeatedly failed to thwart these activities.

   f.   Choice can exercise control over Quality Inn® hotels by:

      i.   distributing information to assist employees in identifying human trafficking;

ii. providing a process for escalating human trafficking concerns within the organization;

iii. requiring all employees to attend training related to human trafficking;

iv. providing new hire orientation on human rights and corporate responsibility;

v. providing training and education to Quality Inn® hotels through webinars, seminars, conferences, and online portals;

vi. developing and holding ongoing training sessions on human trafficking;

vii. conducting audits of training protocols; or

viii. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

g. Choice is in an agency relationship with its Quality Inn® hotels offering public lodging services. This agency relationship was created and is maintained through Choice's exercise of an ongoing and systemic right of control over Quality Inn® hotels by Choice's operations, including the means and methods of how Quality Inn® hotels conduct daily business including:

i. hosting online bookings on Choice's domain;

ii. requiring Quality Inn® hotels to use Choice's customer rewards program;

      iii.  setting parameters on employee wages;

      iv.  making employment decisions;

      v.  advertising for employment;

      vi.  sharing profits;

      vii.  standardized training methods for employees;

      viii.  building and maintaining the facility in a manner specified by Choice;

      ix.  standardized or strict rules of operation;

      x.  regular inspection of the facility and operation by Choice;

      xi.  fixing prices; or

      xii.  other actions that deprive Quality Inn® hotels of any independence in their business operations.

h.  Apparent agency also exists between Choice and Quality Inn® hotels. Choice holds out Quality Inn® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

i.  Given Choice's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Choice breached its duties in the following ways:

      i.  Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

      ii.  Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

    iii.  Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

    iv.  Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

    v.  Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi.  Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

    vii.  Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

j.  For years, Choice has demonstrated willful blindness to the rampant sex trafficking occurring throughout its Quality Inn® brand across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff E.S. at a Quality Inn® that forms the basis for this complaint.

    i.  In January of 2019, two women were rescued from the Quality Inn® hotel in Battle Creek, Michigan. The men who trafficked these women used drugs and physical violence forcing the women to prostitute themselves. [92]

    ii.  In May of 2017, women were trafficked out of a Quality Inn® in

---

[92] https://www.battlecreekenquirer.com/story/news/2019/01/14/lansing-battle-creek-human-trafficking-quality-inn/2570625002/

Jacksonville, Florida.[93]

   iii.  In July of 2013, a man and a woman recruited and harbored a 16-year-old girl for the purposes of trafficking her for commercial sex out of a Quality Inn® in Columbia, South Carolina.[94]

   iv.  In January of 2015, a man was arrested for trafficking of a fifteen year-old girl out of a Quality Inn in Miami, Florida.[95]

   v.  In January of 2017, a man was convicted for human trafficking a woman out of a Quality Inn® hotel.[96]

   vi.  In February of 2015, a seventeen year old girl was being held, drugged and sexually exploited out of a Quality Inn® in Raynham, Massachusetts.[97]

### D.  THE SEX TRAFFICKING OF E.S.

165.  The facts alleged herein stem from a sex trafficking ring operating Dallas/Fort Worth, Texas.  While victimized by her traffickers, E.S. was subject to rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotels.

166.  In 2004, E.S. was 21 years-old when she was coerced into a partnership with a man who would become her trafficker. He convinced her to move in with him under the guise that he would help her save money to start her own hair salon and eventually help buy her a house. This financial security was appealing to E.S. and in 2006 she decided to move in with

---

[93] https://www.jacksonville.com/news/public-safety/2017-05-31/jacksonville-man-43-arrested-human-trafficking-charges
[94] https://www.wistv.com/story/22961765/two-in-columbia-netted-in-nationwide-child-sex-trafficking-bust/
[95] https://www.nbcmiami.com/news/local/alleged-pimp-for-runaway-teen-facing-sex-trafficking-charge-miami-dade-police/114104/
[96] https://www.dothaneagle.com/news/crime_court/website-hotel-assailant-all-being-sued-as-a-result-of/article_eef1d91c-e3fd-11e6-a872-1bdefa8794b3.html
[97] https://raynham.wickedlocal.com/article/20150212/NEWS/150218308

him.

167.    After the move, the man changed his behavior and became possessive over E.S. He stopped letting her leave the house and eventually turned the doorknob to her room inside out to lock her in. She was only allowed to leave the room to shower, eat and go on supervised outcalls for her trafficker. Her trafficker kept her complicit throughout her imprisonment in this room by drugging her with ecstasy and painkillers. E.S. stated that she believes her trafficker only stopped locking her in the room because he was, "Trying to break her," and once the desired result was achieved she was allowed to leave the room.

168.    At first, E.S.'s trafficker controlled all of the calls for clients. He placed advertisements on the Internet, specifically backpage.com and in local magazines and newspapers. He would rarely allow E.S. to keep any of the money she earned, and completely disregarded the promises of financial security for her and her daughter he made her prior to her trafficking.

169.    Her trafficker controlled a ring of girls, whom he trafficked in the above-refernced hotels throughout the Dallas/Fort Worth between approximately 2006 and 2011. When checking into the hotels, E.S. would use both a fake ID and a federal ID. The reservations varied from being in her name, his name or one of the other girls being trafficked. They would pay for the rooms in cash or with a pre-paid card. While staying in the rooms they would often call for extra towels, refuse service, and leave trashcans full of condoms, baby wipes, and empty bottles of lube. E.S. also remembers hearing screaming from down the hall, while other girls were being beaten by men in the trafficking ring. Additionally, there was significant foot traffic within the hotels that her trafficker frequented.

170.    E.S. was forced to service between 8-10 men a day. Her trafficker did not provide a specific quota, but if she did not come home with a sizable profit her trafficker would intimidate and threaten her, causing E.S. significant fear and emotional turmoil.

171.    Oftentimes, while staying in the defendant's rooms, housekeeping would knock, but they would refuse service. However, they often called the front desk for extra towels, which were left outside the room.

172.    While staying at the Best Western at 201 Western Loop 820 North in Fort Worth, Texas, E.S. was removed from the premises because the hotel staff saw her backpage.com advertisement. E.S. and those involved in the trafficking ring were not allowed back to this Best Western. However, despite the circumstances being identified they were afterwards permitted at other Best Western hotels.

173.    Prior to, during, and following the incidents described herein, each Defendant had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. Each Defendant failed to take any actions to curtail these activities.

174.    Had each Defendant been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of E.S.

### E.  THE DEFENDANTS FACILITATED THE TRAFFICKING OF E.S.

175.    Defendants, ESA, G6, Marriott International, Best Western, Wyndham and Choice profited from the sex trafficking of E.S. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. Each Defendant leased rooms to E.S.'s

traffickers, when they knew, or should have known, that he was using their rooms to imprison E.S., physically assault her, and subject her to repeated exploitation as he forced her into sexual servitude.

176.     Defendants, ESA, G6, Marriott, Best Western, Wyndham and Choice knew, or should have known, that E.S. was being trafficked and that each Defendant was knowingly benefiting financially from said exploitation, because E.S.'s trafficker frequented each of the Defendants' hotels.

177.     Defendants, ESA, G6, Marriott, Best Western, Wyndham and Choice knew, or should have known, that E.S. was being trafficked because E.S. constantly entertained traffic to appease her traffickers' expectations, when checking into the hotels, E.S. would use both a fake ID and a federal ID. The reservations varied from being in her name, her traffickers name or one of the other girls being trafficked. They would pay for the rooms with cash or a prepaid card; behavior that indicated they were using each of the Defendants' hotels for his illegal sex trafficking venture.

178.     Defendants, ESA, G6, Marriott, Best Western, Wyndham and Choice actively participated in this illegal endeavor by knowingly or negligently providing lodging to E.S.'s trafficker in which to harbor E.S. while he was trafficking her.

179.     Defendants, ESA, G6, Marriott, Best Western, Wyndham and Choice profited from the sex trafficking of E.S. and knowingly or negligently aided and participated with E.S.'s trafficker in his criminal venture.

180.     Defendants ESA, G6, Marriott, Best Western, Wyndham and Choice actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from E.S. in which to harbor E.S. while she was being trafficked.

181.     Defendants ESA, G6, Marriott, Best Western, Wyndham and Choice all had the opportunity to stop E.S.'s trafficker and offenders like him from victimizing E.S. and others like her.   Instead, each Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

182.     Defendants ESA, G6, Marriott, Best Western, Wyndham and Choice all financially benefited from the sex trafficking of E.S., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

183.     Defendants ESA, G6, Marriott, Best Western, Wyndham and Choice enjoy the steady stream of income that sex traffickers bring to their budget level hotel brands.

184.     Defendants ESA, G6, Marriott, Best Western, Wyndham and Choice financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

185.     Defendants ESA, G6, Marriott, Best Western, Wyndham and Choice failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

186.     Defendants ESA, G6, Marriott, Best Western, Wyndham and Choice maintained their deficiencies to maximize profits by:

a.   Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b.   Not refusing room rentals, or reporting guests to law enforcement, in order to

maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    c.   Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

187.    As a direct and proximate result of these egregious practices on the part of the Defendants ESA, G6, Marriott, Best Western, Wyndham and Choice, E.S. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A.  COUNT ONE – 18 U.S.C §1595 ("TVPRA")

188.    Plaintiff E.S. incorporates each foregoing allegation.

189.    E.S. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

190.    Best Western's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Best Western had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a).  At all relevant times, Best Western breached this duty by participating in, and facilitating, the harboring and providing of E.S. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

191.    Best Western has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment

of their customer base that seeks to participate in the sex trade.  Moreover, Best Western directly benefitted from the trafficking of E.S. on each occasion they received payment for rooms that she was being kept in at the Best Western's brand hotels. The actions, omissions, and/or commissions alleged in this pleading were the proximate cause of E.S.'s injuries and damages.

192.    E.S. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Best Western's hotels and properties in violation of 18 U.S.C. §1591 (a).

### B.  COUNT TWO – 18 U.S.C §1595 ("TVPRA")

193.    Plaintiff E.S. incorporates each foregoing allegation.

194.    E.S. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

195.    Marriott's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Marriott had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a).  At all relevant times, Marriott reached this duty by participating in, and facilitating, the harboring and providing of E.S. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

196.    Marriott has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, Marriott directly benefitted from the trafficking of E.S. on each occasion they received payment for rooms that she was being kept in at Marriott's hotels. The actions, omissions, and/or commissions alleged in this pleading were the proximate cause of E.S.'s injuries and damages.

197.    E.S. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Marriott's hotels and properties in violation of 18 U.S.C. §1591 (a).

## C.  COUNT THREE – 18 U.S.C §1595 ("TVPRA")

198.    Plaintiff E.S. incorporates each foregoing allegation.

199.    E.S. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

200.    ESA's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, ESA had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a).  At all relevant times, ESA breached this duty by participating in, and facilitating, the harboring and providing of E.S. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

201.    ESA has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, ESA directly benefitted from the trafficking of E.S. on each occasion they received payment for rooms that she was being kept in at ESA's hotels. The actions, omissions, and/or commissions alleged in this pleading were the proximate cause of E.S.'s injuries and damages.

202.    E.S. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at ESA's hotels and properties in violation of 18 U.S.C. §1591 (a).

### D.  COUNT FOUR – 18 U.S.C §1595 ("TVPRA")

203.    Plaintiff E.S. incorporates each foregoing allegation.

204.    E.S. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

205.    G6's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, G6 had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a).  At all relevant times, G6 breached this duty by participating in, and facilitating, the harboring and providing of E.S. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

206.    G6 has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, G6 directly benefitted from the trafficking of E.S. on each occasion they received payment for rooms that she was being kept in at G6's hotels. The actions, omissions, and/or commissions alleged in this pleading were the proximate cause of E.S.'s injuries and damages.

207.    E.S. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at G6's hotels and properties in violation of 18 U.S.C. §1591 (a).

### E.  COUNT FIVE – 18 U.S.C §1595 ("TVPRA")

208.    Plaintiff E.S. incorporates each foregoing allegation.

209.    E.S. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

210.    Wyndham's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Wyndham had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a).   At all relevant times, Wyndham breached this duty by participating in, and facilitating, the harboring and providing of E.S. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

211.    Wyndham has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.   Moreover, Wyndham directly benefitted from the trafficking of E.S. on each occasion they received payment for rooms that she was being kept in at Wyndham's hotels. The actions, omissions, and/or commissions alleged in this pleading were the proximate cause of E.S.'s injuries and damages.

212.    E.S. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Wyndham's hotels and properties in violation of 18 U.S.C. §1591 (a).

### F.  COUNT SIX – 18 U.S.C §1595 ("TVPRA")

213.    Plaintiff E.S. incorporates each foregoing allegation.

214.    E.S. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

215.    Choice's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Choice had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to

engage in violations of 18 U.S.C. §1591 (a).  At all relevant times, Choice breached this duty by participating in, and facilitating, the harboring and providing of E.S. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

216.    Choice has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, Choice directly benefitted from the trafficking of E.S. on each occasion they received payment for rooms that she was being kept in at Choice's hotels. The actions, omissions, and/or commissions alleged in this pleading were the proximate cause of E.S.'s injuries and damages.

217.    E.S. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Choice's hotels and properties in violation of 18 U.S.C. §1591 (a).

## PRAYER FOR RELIEF

WHEREFORE, based on the forgoing, the Plaintiff seeks injunctive relief in the form of a judgment requiring the Defendants to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising  umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated  to the Plaintiff herein.

AND WHEREFORE, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendants' wrongs and

injuries to the Plaintiff due to the Defendants' faulty conduct, including but not limited to:

    a.  All available compensatory damages for the described losses with respect to each cause of action;

    b.  past and future medical expenses, as well as the costs associated with past and future life care;

    c.  past and future lost wages and loss of earning capacity;

    d.  past and future emotional distress;

    e.  consequential and/or special damages;

    f.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    g.  punitive damages with respect to each cause of action;

    h.  reasonable and recoverable attorneys' fees;

    i.  costs of this action; and

    j.  pre-judgment and all other interest recoverable

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury on all issues so triable in this civil action.

Dated: April 24, 2020

Respectfully submitted,

THE LANIER LAW FIRM, P.C.


*/s/ W. Mark Lanier*
W. Mark Lanier
Texas State Bar No.: 11934600
WML@lanierlawfirm.com
Monica Cooper (*pro hac vice* to be filed)
State Bar No.: 24071344
Monica.Cooper@lanierlawfirm.com
10940 W. Sam Houston Pwky North, Suite 100
Houston, Texas 77064
Telephone: (713) 659-5200
Facsimile: (713) 659-2204

**Attorneys for Plaintiff E.S.**


## CERTIFICATE OF SERVICE

I hereby certify that on this the 24th day of April, 2020, the foregoing was filed through the Court's CM/ECF System, which will send a notice of electronic filing to any listed counsel of record.


*/s/ W. Mark Lanier*
W. Mark Lanier